IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| HUNTER SMITH, | ) |
| Plaintiff, | ) Case No. 3:12-cv-01024 |
| | ) Senior Judge Haynes |
| v. | ) |
| HON. JOHN M. MCHUGH, | ) |
| Secretary of the Army, | ) |
| Defendant. | ) |

**MEMORANDUM**

Plaintiff, Hunter Smith, filed this action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII") against Defendant, John M. McHugh, Secretary of the Army, Plaintiff's former employer. Plaintiff's sexual harassment and retaliation claims arise out of his termination that he contends was discriminatory because of his gender and his complaints of sexual harassment.

Before the Court is Defendant's motion for summary judgment (Docket Entry No. 34) contending, in sum: that Plaintiff's proof fails to establish his claims; that Defendant responded to Plaintiff's sexual harassment claims; and that Defendant had a non-discriminatory reason to terminate Plaintiff. In his response, Plaintiff asserts that he has submitted sufficient evidence in support of his claims (Docket Entry No. 51).

For the reasons set forth below, the Court concludes that Defendant's motion for summary judgment (Docket Entry No. 34) should be granted because Plaintiff lacks sufficient proof to support a judgment on his Title VII claims.

## A. Findings of Fact[1]

On August 27, 2008, Plaintiff was employed by the Army at the Fort Campbell Gear-to-Go shop for the Directorate of Morale Welfare and Recreation. (Docket Entry No. 51-4, Response to Statement of Undisputed Facts, at ¶ 1). Plaintiff was appointed as a non-appropriated fund employee and was working as a flex laborer. Id. Flex employees are not guaranteed hours and work on an as-needed basis. Id. at ¶ 3. Plaintiff's immediate supervisor was Cynthia Clack and the next-level supervisor was Jody Petty, a man. Id. at ¶ 4. On his hire date, Plaintiff received No-FEAR Act training on how to report claims of discrimination, including sexual harassment. Id. at ¶ 7. On February 27, 2009, Plaintiff also received prevention of sexual harassment training. Id. Plaintiff received this training again on December 3, 2009. Id. at ¶ 16.

According to Plaintiff, he began a sexual relationship with Clack three to four weeks after Plaintiff began working for Clack. Id. at ¶ 6. Plaintiff describes the "sexual relationship" as continuing until July or August 2009, but that "the relationship ended at Christmas 2009." Id. Clack stated that during Plaintiff's employment she never had a relationship with Plaintiff but on one occasion before Plaintiff was hired, Clack and Plaintiff had a sexual encounter. (Docket Entry No. 52-1, Excerpts from Report of Investigation, at 62). According to Clack, this

---

[1] Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247-52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The Court concludes that under the applicable law, there are not any material factual disputes. Thus, this section constitutes a finding of facts.

encounter was "a drunken mistake" that was not repeated. Id. at 63.

On April 10, 2009, the Department of Morale, Welfare and Recreation ("DMWR") headquarters' Installation Management Command issued a communique called Net Call Seven. (Docket Entry No. 51-4 at ¶ 9; Docket Entry No. 37, Excerpts from Fact-Finding Conference, Jody Petty Deposition, at 26, 31). Net Call Seven was a policy to convert flex workers into part-time employees. (Docket Entry No. 51-4 at ¶ 9). Petty had approval authority for this process, and he instructed Clack to submit the names of eligible employees. Id. at ¶¶ 10-11. Because Petty decided not to convert all employees at one time, Petty asked Clack to rank the employees in order of merit. Id. at ¶ 11. Plaintiff and another male employee were ranked in the third of three groups for conversion to a part-time position. Id. at ¶ 13. According to Defendant, Clack ranked the employees based on their tenure at Gear-to-Go, their position level, and whether the employee had a full-time job outside of Gear-to-Go. Id. at ¶ 12.

According to Plaintiff, his ranking in the third group was "because of this declining relationship with Clack," and the other male employee in his group "got into it numerous times with Jodi Petty (sic)." Id. at ¶ 13. All members of the first priority group were converted, as were some of the second priority group. (Docket Entry No. 37 at 30).

On May 28, 2009, the Army issued a second communique, Net Call Ten, that because the flex conversions were not cost effective, flex employees would no longer be converted from flex to part-time. (Docket Entry No. 51-4 at ¶ 14). Plaintiff and the other male employee in the third group had not yet been converted and remained flex employees. Id.

During the summer of 2009, Plaintiff began a relationship with another woman, and states that Clack "g[ot] a little agitated" and "her attitude . . . changed toward [Plaintiff]." Id. at ¶

3

15. In December 2009, Plaintiff ended the relationship with Clack and began seriously dating another woman. Id. at ¶ 17. On a March 15, 2010 performance evaluation, Clack rated Plaintiff as an "excellent" overall employee and a "success." (Docket Entry No. 39 at 5-6). Clack also wrote positive comments about Plaintiff's performance. Id.

On July 10, 2010, Plaintiff reported his relationship with Clack to Debbie Thomas, the Human Resources officer. (Docket Entry No. 51-4 at ¶ 19). Under Fort Campbell's policy, EEO reports are confidential until written permission is given for a formal inquiry into the allegations. Id. at ¶ 8. Plaintiff stated that he did not want to press charges against Clack, but requested transfer from her department. Id. at ¶ 19.

After this conversation, Plaintiff received a job offer from a friend. Id. at ¶ 20. About the same time, Plaintiff states that Clack threatened to fire Plaintiff and told him that "if he wasn't going to see her after work, he wasn't going to see her at work." (Docket Entry No. 37, Plaintiff Deposition, at 44). Plaintiff then told Thomas that he did want to make a formal complaint against Clack. Id. On August 9, 2010, Thomas arranged a meeting between Plaintiff, Thomas, and Petty. (Docket Entry No. 51-4 at ¶¶ 21, 22). Plaintiff's complaints were that Clack threatened to terminate him and that Clack had not converted his flex position to a part-time position. Id. at ¶ 22.

Plaintiff informed Petty and Thomas that he did not want Clack fired, but requested a transfer. (Docket Entry No. 37 at 8). Plaintiff stated that he would take the job offer from his friend and "give [Defendant] time to move [Plaintiff] or to move [Clack] or do whatever [they're] going to do" and thereafter, "when y'all find out a position or something to do with [Plaintiff]," they should "call [him] back and [he'll] come back." Id. Petty intended to move

4

Plaintiff to another section immediately without loss of pay or hours, but Plaintiff chose to take the outside job offer. Id. at 36.

Immediately after this meeting, Petty consulted with Bob Vail, his supervisor, and a labor attorney. (Docket Entry No. 51-4 at ¶ 25). An Army Regulation 15-6 investigation ("AR 15-6") was conducted to investigate Plaintiff's allegations. Id. According to Defendant, Petty also removed Clack from her position; but Plaintiff contends that Clack was "merely asked to help other facilities." Id.

An Investigating Officer was appointed to conduct the AR 15-6. Id. at ¶ 26. The Investigating Officer took sworn statements from Plaintiff, Clack, and fourteen other employees. Id. at ¶ 27. The Investigating Officer concluded that there was no evidence that Plaintiff and Clack engaged in a sexual relationship. Id. at ¶ 28. Yet, in the course of the investigation, the Investigating Officer uncovered several other acts of mismanagement by Clack. Id. The Investigating Officer determined that Clack allowed an employee with a suspended license to drive a government vehicle and that she allowed a homeless employee to reside in a Gear-to-Go trailer, among other offenses. Id.

As a result of these findings, Clack was removed from her supervisory position and received a thirty day suspension without pay. Id. at ¶ 30. Although Plaintiff contends that Petty recommended this discipline, Defendant asserts that the Deputy Garrison Commander determined Clack's punishment. Id. On August 20, 2010, Petty informed Plaintiff of Clack's transfer. Id. at ¶ 31. Petty asked Plaintiff to return to work, but told Plaintiff that he would not be guaranteed hours. Id. at ¶¶ 31, 32. Plaintiff requested a guarantee of his prior forty hours per week and Petty stated that he would review Plaintiff's records to determine the number of hours

5

Plaintiff was actually working previously. Id. at ¶ 32. After his review, Petty found a time card error that showed Plaintiff working forty-four hours in one day. Id. at ¶ 33. Petty then set a meeting on August 24, 2010 for himself, Plaintiff, and Mike Childers, Plaintiff's new acting supervisor. Id. at ¶¶ 34-35.

Childers drove Plaintiff to the August 24, 2010 meeting with Petty and during this time Childers told Plaintiff that if Plaintiff would recant his allegations against Clack, Childers would help Plaintiff obtain a full-time position at Gear-to-Go. Id. at ¶ 34. Plaintiff requested this assurance in writing. Id. At the meeting Petty informed Plaintiff of the time card error. Id. at ¶ 35. Plaintiff denied the time card error, but received a written notice to repay $600 in wages for this overtime. Id. at ¶¶ 34, 36. Plaintiff has not paid this assessment. Id.

On August 28, 2010, Plaintiff hosted a housewarming party with several co-workers, including a young man referred to in the record as "JB." Id. at ¶¶ 37, 38. Although JB was under twenty-one years old, he consumed alcohol at the party and subsequently blacked out. Id. While JB was blacked out, the other employees, including Plaintiff, put peanut butter on JB, allowed Plaintiff's dog to lick the peanut butter off, and took photographs of the incident. Id. at ¶ 39. The next week, Plaintiff brought the pictures to work and showed them to other employees. Id. at ¶ 40. These employees teased JB about the incident. Id.

Defendant asserts that the peanut butter was spread on JB's testicles; Plaintiff contends that the peanut butter was on JB's leg. Id. at ¶ 39; Docket Entry No. 37 at 46. According to Plaintiff, while peanut butter had never actually been spread on JB's testicles, he and the other employees did tease JB by telling him that it had been on his testicles. (Docket Entry No. 37 at 47). JB wrote several conflicting statements about the incident. Id. at 60-67. JB submitted three statements and

6

said they were coerced by both Plaintiff and Petty. Id. at 60-67. JB's first statement described the peanut butter as on his leg, because "it was suggested [that he make this claim]," and later asserted that his first statement was coerced. Id. at 62. JB did not remember the incident, but claimed to have seen the pictures at work. Id. at 53-54. At his deposition, JB testified that in the picture he was shown, peanut butter was spread on his testicles. Id. at 66-67.

Petty met with Plaintiff to discuss the pictures. (Docket Entry No. 51-4 at ¶ 42). According to Defendant, Travis Parker, another employee, observed Plaintiff and others teasing JB and showing the pictures and Parker reported these acts to Childers. Id. at ¶ 41. Plaintiff contends that Childers reported the incident to Petty before Parker was aware of the situation. Id. During the meeting with Petty, Plaintiff admitted that he distributed a picture of JB in his boxer shorts with a dog licking peanut butter off of his body. Id. at ¶ 42. Plaintiff asserted that the peanut butter was on JB's leg. Id.

According to Plaintiff, on September 23, 2010, Petty told Plaintiff to resign or be terminated. Id. at ¶ 44. Plaintiff refused to resign and was given a notice of separation that day. Id. at ¶ 45; Docket Entry No. 40 at 31-32. Petty informed Plaintiff of his termination effective September 30, 2010 for Plaintiff's "failure to adhere to EEO policies which caused an adverse effect on the morale of fellow employees." Id. at 31. Petty's notice includes a "specification" that: "[o]n September 9, 2010, you were witnessed at work showing to co-workers, explicit and degrading photographs of a fellow employee that were taken at your house." Id.

On September 14, 2010, Plaintiff contacted an EEO counselor, alleging his termination was

a reprisal for his formal complaint of harassment. Id. at 5-9.[2] October 10, 2010, Plaintiff filed a formal complaint of discrimination for sex discrimination and reprisal. Id. at 1-3.[3] A notification of personnel action was later issued that separated Plaintiff effective on January 5, 2011. Id. at 33.

## B. Conclusions of Law

"The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fed. R. Civ. P. 56 advisory committee notes. Moreover, "district courts are widely acknowledged to possess the power to enter summary judgments sua sponte, so long as the losing party was on notice that [he] had to come forward with all of [his] evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986); accord Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.
>
> As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law

---

[2]Defendant and Plaintiff agree that Plaintiff made initial contact with the EEO counselor on September 14, 2010. (Docket Entry No. 51-4 at ¶ 47). The complaint lists this same date. (Docket Entry No. 40 at 5). Yet the alleged discriminatory action is dated September 23, 2010. Id.; Docket Entry No. 51-4 at ¶ 45.

[3]Although parties agree the formal complaint was filed on October 18, 2010 (Docket Entry No. 51-4 at ¶ 48), the complaint is dated October 10, 2010 (Docket Entry No. 40 at 2).

will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted.

477 U.S. at 247-48 (emphasis in original). Earlier the Supreme Court defined a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Electrical Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery. Celotex, 477 U.S. at 326 (1986). Where there has been a reasonable opportunity for discovery, the party opposing the motion must make an affirmative showing of the need for additional discovery after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d 351, 355-57 (6th Cir. 1989). But see Routman, 873 F.2d at 971.

There is a certain framework in considering a summary judgment motion as to the required showing of the respective parties, as described by the Court in Celotex:

> Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. . . . [W]e find no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule 56(c) standards." Martin v. Kelley, 803 F.2d 236, 239 n. 4 (6th Cir. 1986). The moving party's burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991) (quoting Kochins v.

Linden-Alimak, Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of 'demonstrat[ing] the absence of a genuine issue of material fact,' the nonmoving party then 'must set forth specific facts showing that there is a genuine issue for trial.'" Emmons, 874 F.2d at 353 (quoting Celotex, 477 U.S. at 323 and Rule 56(e)).

Once the moving party meets its initial burden, the United States Court of Appeals for the Sixth Circuit warned that "the respondent must adduce more than a scintilla of evidence to overcome the motion [and] . . . must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting Liberty Lobby, 477 U.S. at 257). Moreover, the Court of Appeals explained that:

> The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1480 (citations omitted). See also Hutt v. Gibson Fiber Glass Products, 914 F.2d 790, 792 (6th Cir. 1990) ("A court deciding a motion for summary judgment must determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'") (quoting Liberty Lobby, 477 U.S. at 251-52).

If both parties make their respective showings, the Court then determines if the material factual dispute is genuine, applying the governing law.

> More important for present purposes, summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.
>
> . . . .

> Progressing to the specific issue in this case, we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict – "whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."

Liberty Lobby, 477 U.S. at 248, 252 (citation omitted).

It is likewise true that:

> In ruling on [a] motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: "The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute . . . ."

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986).

The Sixth Circuit further explained the District Court's role in evaluating the proof on a summary judgment motion:

> A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establish a genuine issue of material fact for trial. This marshalling of evidence,

however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New InterNational Dictionary (1986).

Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). Here, the parties have given some references to the proof upon which they rely. Local Rules 56.01(b)-(d) require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions:

1. Complex cases are not necessarily inappropriate for summary judgment.

2. Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

3. The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5. A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

6. As on federal directed verdict motions, the "scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7. The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8. The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9. The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10. The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1479-80 (citations omitted).

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) whether the moving party has "clearly and convincingly" established the absence of material facts; (2) if so, whether the plaintiff has presented sufficient facts to establish all the elements of the asserted claim or defense; (3) if factual support is presented by the nonmoving party, whether those facts are sufficiently plausible to support a jury verdict or judgment under the applicable law; and (4) whether there are any genuine factual issues with respect to those material facts under the governing law.

There are two types of Title VII employment discrimination: disparate treatment and disparate impact. Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n. 15 (1977). "To base a claim on disparate treatment, the plaintiff must show discriminatory motive. Such proof can be established by direct evidence or may be inferred based on a prima facie showing of discrimination."

Huguley v. Gen. Motors Corp., 52 F.3d 1364, 1370 (6th Cir. 1995) (citation omitted). "'Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.' It does not require the fact finder to draw any inferences to reach that conclusion." Amini v. Oberlin Coll., 440 F.3d 350, 359 (6th Cir. 2006) (quoting Kocak v. Cmty. Health Partners of Ohio, Inc., 400 F.3d 466, 470 (6th Cir. 2005)).

Absent direct evidence, a Title VII claim is evaluated under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), that requires Plaintiff to establish "(1) [he] was a member of a protected class; (2) [he] suffered an adverse employment action; (3) [he] was qualified for the position; and (4) [he] was replaced by someone outside the protected class or was treated differently than similarly situated, non-protected employees." Williams v. Zurz, 503 F. App'x. 367, 376 (6th Cir. 2012). If a plaintiff can establish such proof, the defendant must demonstrate a legitimate reason for the termination; in order to succeed, a plaintiff then must prove this reason is pretextual.

As to gender discrimination, Plaintiff has not shown that he was treated differently than a similarly situated female employee. Clack's conduct was mismanagement. Plaintiff's misconduct was embarrassing a young co-employee in front of other employees.

For sexual harassment, Plaintiff's theory is "quid pro quo" sexual harassment for which Plaintiff must prove:

> 1) that the employee was a member of a protected class; 2) that the employee was subjected to unwelcomed sexual harassment in the form of sexual advances or requests for sexual favors; 3) that the harassment complained of was on the basis of sex; 4) that the employee's submission to the unwelcomed advances was an express or implied condition for receiving job benefits or that the employee's refusal to submit to the supervisor's sexual demands resulted in a tangible job detriment; and 5) the existence of respondeat superior liability.

Howington v. Quality Rest. Concepts, LLC, 298 F. App'x 436, 441 (6th Cir. 2008)

Under Title VII, in a quid pro quo sexual harassment claim, the supervisor must possess "the authority to hire, fire, transfer, and promote." Wisniewski v. Pontiac Sch. Dist., 862 F.Supp.2d 586, 597 (E.D. Mich. 2012) (citing 42 U.S.C. § 2000e et seq.). Plaintiff does not prove that Clack possessed such authority. Moreover, the two acts cited by Plaintiff—that he was not converted to a full-time employee and that he was terminated—were both decisions by Petty, not Clack. Plaintiff admits that Petty had final authority over the flex conversions. (Docket Entry No. 51-4 at ¶ 11). Petty also signed Plaintiff's notice of separation and informed Plaintiff to either resign or be terminated. (Docket Entry No. 40 at 31-32; Docket Entry No. 51-4 at ¶ 44). Plaintiff implies that Petty was influenced by Clack. Even if true, "[i]nfluence, however, is not authority." Wisniewski, 862 F.Supp.2d at 597. In any event, Clack's suspension for mismanagement belies her influence.

For sexual harassment, Title VII requires that the "workplace is permeated with 'discriminatory intimidation, ridicule, and insult,'" and that it "is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment' . . . ." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 65, 67 (1986) (internal citation omitted)). The Court concludes that Plaintiff's evidence does not prove or suggest sexual harassment severe or pervasive enough to alter the conditions of Plaintiff's employment. See Bowman v. Shawnee State Univ., 220 F.3d 456, 463 (6th Cir. 2000) (affirming summary judgment despite proof of "a litany of perceived slights and abuses," including sexually offensive language).

Assuming Plaintiff's proof could rise to this level, Plaintiff's inappropriate treatment of a

fellow employee in the workplace and failure to repay wages that were improperly paid are legitimate reasons to terminate Plaintiff and those reasons are not shown to be pretextual.

As to Plaintiff's assertion that any discipline resulting from the JB incident should have followed the Table of Penalties in AR 215-3, Chapter 7, this chapter expressly does not apply to "separations from limited tenure or flexible appointments." (Docket Entry No. 51-3 at 2).

As to Plaintiff's retaliation claim, Plaintiff must prove "(1) that plaintiff engaged in an activity protected by Title VII; (2) that the exercise of [the plaintiff's] civil rights was known by the defendant; (3) that, thereafter, the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action." Williams v. Gen. Motors Corp., 187 F.3d 553, 568 (6th Cir. 1999) (citing Wrenn v. Gould, 808 F.2d 493, 500 (6th Cir. 1987)).

After Plaintiff's complaint about Clack's behavior, Petty requested an AR 15-6 investigation that was conducted. (Docket Entry No. 51-4 at ¶¶ 19, 25). As to his non-conversion from flex time, the later Net Call Ten policy prohibited this practice and Plaintiff was not eligible for conversion. (Docket Entry No. 51-4 at ¶ 14). As to Plaintiff's termination, for the reasons stated above Defendant had ample and legitimate reasons to terminate Plaintiff.

For these reasons, the Court concludes that Defendant's motion for summary judgment (Docket Entry No. 34) should be granted.

An appropriate Order is filed herewith.

ENTERED this 30th day of September, 2015.

WILLIAM J. HAYNES, JR.
Senior United States District Court